IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LANCE ARMAN CROMWELL,

       Petitioner,                     No. CIV S-06-2412 CHS

  vs.

K. PROSPER, et al.,

       Respondents.    <u>AMENDED ORDER GRANTING PETITION</u>

_____/

## I.  INTRODUCTION

Petitioner, a state prisoner, proceeds pro se with a third amended petition for writ of habeas corpus pursuant to 28 U.S.C. §2254.  The matter is submitted for decision and the parties have consented to jurisdiction by a United States Magistrate Judge.

## II.  BACKGROUND[1]

Petitioner was charged by information in the Shasta County Superior Court, case number 03F4527, with one count of being a felon in possession of a firearm and one count of misdemeanor driving without a license.  On the eve of trial, petitioner admitted the misdemeanor

---

[1] This statement of facts is adapted from the unpublished opinion of the California Court of Appeal, on direct review of petitioner's criminal case.  *See People v. Cromwell*, No. C046933, slip op. at 2-4 (Cal. Ct. of App., 3rd Dist. September 1, 2005).

charge and filed a motion pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), to exclude incriminating statements he made to the investigating officer concerning possession of the firearm.  In response, the court held an evidentiary hearing pursuant to section 402 of the California Evidence Code.

At the hearing, Shasta County Deputy Sheriff John Kropholler testified he was in uniform and driving a marked patrol vehicle in a rural residential are of Shasta County at approximately 12:30 a.m. on the morning of November 10, 2001, when he observed a blue Toyota without a front license plate going in the opposite direction.  Kropholler, who was accompanied that night by a uniformed but unarmed training cadet, made a U-turn and activated the patrol vehicle's overhead lights.  The Toyota turned into a driveway in a residential neighborhood and came to a stop.  Kropholler alighted and approached the Toyota, which had two occupants: petitioner, the driver, and Debra Ripley, petitioner's girlfriend, the front seat passenger.  Petitioner appeared nervous and could not produce a driver's license.  He gave Kropholler his true name but denied being on parole.  Kropholler returned to his patrol vehicle and ran a records check, which disclosed petitioner was on active parole and subject to a parole search condition.  Kropholler returned to the Toyota, informed petitioner he was subject to a parole search condition, and asked petitioner to step out of the Toyota while he conducted the search.  After frisking petitioner for weapons, he noticed petitioner continued to act nervously and was glancing about, leading Kropholler to believe petitioner was a flight risk.  Kropholler escorted petitioner to the patrol vehicle and asked him to sit in the back seat while he conducted the search.  He did not handcuff petitioner and told petitioner that he was not under arrest and that his request was made for "officer safety."

Kropholler closed the back door of the patrol vehicle, which locked the back doors.  When he opened the trunk of the Toyota, he saw an unloaded shotgun.

Kropholler showed the gun to Ripley, who was standing between the two vehicles.  Ripley responded "[t]hat they had just picked it up from [petitioner's] parents' house

just a little bit ago, and petitioner was going to use it to go shooting with his boss the next day."

Kropholler returned to the patrol vehicle, put the gun in the trunk, and opened the rear passenger door.  In Kropholler's words, "I just opened the passenger side to my patrol car, and as I sat there,[2] that's when I asked him about if he knew anything about the gun that was in the car."  "First, he told me he had no idea about the gun at all."  And when I confronted him with what Ms. Ripley had told me, he told me that he borrowed the gun from- I believe his mother's boyfriend so that he could go shooting with his boss the next day."  Kropholler asked petitioner whether he knew he could not possess weapons, and petitioner replied that he knew he could not.  Kropholler then arrested petitioner.

When asked about petitioner's demeanor, Kropholler responded: "Again, I would say it wasn't adversarial at all.  He was very nervous due to the fact that I located his gun and then I confronted him with it and the fact that his girlfriend said that they just picked it up.  Other than that, there wasn't anything out of the ordinary."  Kropholler did not give a *Miranda* warning prior to his questioning.

Petitioner's mother testified that the Toyota belonged to her and that she lent it to petitioner on the night he was arrested.  Petitioner testified that the stop was invalid because the front license plate was visible.  He also testified that he was handcuffed before being placed in the back seat of the patrol car.

The trial court found Kropholler's testimony more credible as to the disputed issue whether petitioner was handcuffed before being placed in the patrol car.  Since the amount of time petitioner spent in the back of the patrol car was not unnecessarily prolonged, the trial court reasoned, the restraint was not equivalent to that of formal arrest.  The trial court denied the *Miranda* motion, finding that petitioner was not in custody when he made the incriminating

---

[2] Deputy Kropholler subsequently testified on cross-examination during the 402 hearing that he was standing in the doorway of the patrol car when this conversation occurred. (Reporter's Transcript (hereinafter "RT") at 68, 78.)

1   statement.

2          At trial, the jury heard Kropholler's testimony about the statements petitioner

3   made while seated in the police car.  Kropholler additionally testified at trial that he did not find

4   any ammunition in the Toyota, but that he did notice a significant number of clothes and personal

5   items.  Petitioner's mother testified that the Toyota belonged to her, the gun belonged to her

6   boyfriend, and that she did not tell petitioner the gun was in the trunk when he and his girlfriend

7   borrowed the car.

8          On February 19, 2004, the jury found petitioner guilty of being a felon in

9   possession of a firearm.  On February 24, 2004, the trial court found true the allegation of a prior

10  1993 conviction for two counts of first degree burglary and a 1996 conviction for possessing

11  methamphetamine for sale, and further found that those offenses qualified as prior strikes under

12  California's three strikes law. (*See* Cal. Penal Code §§ 667.5 & 1170.12)  On May 12, 2004,

13  petitioner's motion to dismiss a prior strike was denied, and he was sentenced to an

14  indeterminate term of 27 years to life.

15         Petitioner appealed his convictions to the California Court of Appeal, Third

16  Appellate District; the judgment was affirmed in an unpublished opinion, *People v. Cromwell*,

17  No. C046933.  A petition for review to the California Supreme Court was denied.

18         Petitioner sought habeas corpus relief in the Shasta County Superior Court; his

19  petition was denied in a brief reasoned decision dated October 24, 2006.  The California Court of

20  Appeal, Third District, and the California Supreme Court likewise denied petitioner's claims

21  presented on state habeas corpus, but without written explanation.

22                              III.  CLAIMS

23         The petition presents four grounds for relief.  Petitioner claims:

24         (A) the trial court erred in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436

25  (1966) when it admitted his statements to Kropholler;

26  /////

4

1     (B) the trial court erred in violation of his due process rights when it denied his motion

2     brought pursuant to *People v. Superior Court (Romero)*, 13 Cal.4th 497 (1996);

3     (C) a sentence of twenty seven years to life constitutes cruel and unusual punishment

4     under the United State Constitution and the California Constitution;

5     (D) application of California's "three strikes" law at sentencing breached the terms of

6     petitioner's prior 1993 plea agreement for unrelated offenses; and

7     (E) trial counsel rendered ineffective assistance of counsel by failing to investigate or

8     discover the terms of his prior 1993 plea agreement.

9                    IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

10           An application for writ of habeas corpus by a person in custody under judgment of

11    a state court can be granted only for violations of the Constitution or laws of the United States.

12    28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

13    *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

14    This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

15    the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

16    U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

17    AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

18    state court proceedings unless the state court's adjudication of the claim:

19                (1) resulted in a decision that was contrary to, or involved an
                    unreasonable application of, clearly established Federal law, as
20                  determined by the Supreme Court of the United States; or

21                (2) resulted in a decision that was based on an unreasonable
                    determination of the facts in light of the evidence presented in the
22                  State court proceeding.

23    28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

24    *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

25    This court looks to the last reasoned state court decision in determining whether the law applied

26    to a particular claim by the state courts was contrary to the law set forth in the cases of the United

5

1    States Supreme Court or whether an unreasonable application of such law has occurred.  *Avila v.*

2    *Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).

3                                          V.  DISCUSSION

4              A.        Statements to Kropholler

5              When a person in custody is subjected to interrogation, he must first be read his

6    *Miranda* rights in order for the information obtained to be admissible in court.  *See generally*,

7    *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966).  *Miranda* rights include the right to remain

8    silent, the right to a retained or appointed attorney, and a warning that anything said may be used

9    in court against the suspect.  *Id*.  "Statements elicited in noncompliance with this rule may not be

10   admitted for certain purposes in criminal trial."  *Stansbury v. California*, 511 U.S. 318, 322

11   (1994) (per curiam).

12             For *Miranda* purposes, custodial interrogation means "questioning initiated by

13   law enforcement officers after a person has been taken into custody or otherwise deprived of his

14   freedom of action in any significant way."  *Miranda*, 384 U.S. at 444.  Two discrete inquiries are

15   essential to the custody determination: first, what were the circumstances surrounding the

16   interrogation; and second, given those circumstances, would a reasonable person have felt he or

17   she was not at liberty to terminate the interrogation and leave.  *Thompson v. Keohane*, 516 U.S.

18   99, 112 (1995).  The second inquiry is objective; a court asks whether "there is a formal arrest or

19   restraint on freedom of movement of the degree associated with a formal arrest."  *Maryland v.*

20   *Shatzer*, 130 S. Ct. at 1224 (citing *New York v. Quarles*, 467 U.S. 649, 655 (1984)).

21             An individual detained pursuant to a routine traffic stop need not be given

22   *Miranda* warnings.  *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).  This is because the nature

23   of the detention incident to a routine traffic stop is typically of short duration, and relatively

24   nonthreatening, such that it does not constitute custody for *Miranda* purposes.  *Id*.  In *Berkemer*,

25   the Supreme Court observed:

26   /////

                                                  6

Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced "to speak where he would not otherwise do so freely," *Miranda v. Arizona*, 384 U.S., at 467, 86 S.Ct., at 1624. First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek. See id., at 451, 86 S.Ct., at 1516.

Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in *Miranda* itself, see 384 U.S., at 445, 491-498, 86 S.Ct., at 1612, 1636-1640, and in the subsequent cases in which we have applied Miranda.

*Berkemer*, 468 U.S. at 438-39 (footnotes omitted).

In *Berkemer*, the Supreme Court likened an ordinary traffic stop to a mere investigative detention, or a *Terry* stop,[3] which is not subject to *Miranda*. 468 U.S. at 420, 440; *see also Pennsylvania v. Bruder*, 488 U.S. 9, 10 (1988) (an ordinary traffic stop during which a police officer asks a driver a modest number of questions and requests him to perform a simple

---

[3] During a *Terry* stop, a restricted incidental search for weapons is conducted when warranted by reasonable suspicion. *See Terry v. Ohio*, 391 U.S. 1 (1968).

balancing test at a location visible to passing motorists does not involve "custody" for *Miranda*

purposes).

This is not to say, however, that routine traffic stops cannot become custodial: "If

a motorist who had been detained pursuant to a traffic stop is thereafter subjected to treatment

that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of

protections prescribed by *Miranda*." *Berkemer*, 468 U.S. at 440.  As an example, the Supreme

Court has twice referred to the decision of the Pennsylvania Supreme Court in *Commonwealth v.*

*Meyer*, 488 Pa. 297 (1980), in which a driver detained for approximately half an hour, and

subjected to questioning while in the patrol car, was held to have been in custody for *Miranda*

purposes by the time he was questioned concerning the circumstances of an accident.  *See*

*Pennsylvania v. Bruder*, 488 U.S. 9, 11 n.2 (1988) (citing *Meyer*, 488 Pa. 297); *Berkemer*, 468

U.S. at 442 n.34 (citing *Meyer*, 488 Pa. at 301).  The Supreme Court specifically noted that

*Meyer* involved facts "which might properly remove its result from *Berkemer*'s application to

ordinary stops." *Bruder*, 488 U.S. at 11 n.2.[4]

To determine whether a suspect was in *Miranda* custody, the ultimate inquiry is

whether "there is a formal arrest or restraint on freedom of movement of the degree associated

with formal arrest." *Shatzer*, 130 S. Ct. at 1224 (citing *New York v. Quarles*, 467 U.S. 649, 655

(1984); *see also Stansbury*, 511 U.S. at 322.  "[Supreme Court precedent] make[s] clear,

however, that the freedom-of-movement test identifies only a necessary and not a sufficient

---

[4] In *Meyer*, a police officer came upon a car resting along the guardrail of the interstate; the driver was nearby.  *Meyer*, 488 Pa. at 300.  The police officer approached the driver, who asked about "getting a wrecker to come and take the car off the guardrails."  *Id.* at 301.  Instead of calling a wrecker, the police officer on the scene summoned another patrol car to assist with traffic; the State Police were also contacted.  *Id.*  The driver was told that he would have to wait at the scene until the State Police arrived, and he waited in the patrol car for a portion of this time.  *Id.*  After State Troopers arrived approximately one half-hour later, the driver exited the patrol car and walked to where one of the State Troopers was standing.  *Id.*  The State Trooper requested to see his license and registration, which the driver retrieved from his car.  *Id.*  Without administering *Miranda* warnings, the State Trooper asked the driver "what happened."  *Id.*  The driver responded with statements that were ultimately found by the Pennsylvania Supreme Court to have been taken in violation of *Miranda*.  *Id.*

1    condition for *Miranda* custody." *Shatzer*, 130 S. Ct. at 1224.  A court must examine all the

2    circumstances surrounding the interrogation. *Stansbury*, 511 U.S. at 322.  This is "because

3    *Miranda* is to be enforced 'only in those types of situations in which the concerns that powered

4    the decision are implicated.'" *Id*. (quoting *Berkemer*, 468 U.S. at 437).  The Supreme Court has

5    explained "[i]t is the premise of Miranda that the danger of coercion results from the interaction

6    of custody and official interrogation." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990).  In other

7    words,

8               [t]he warning mandated by *Miranda* was meant to preserve the
                privilege during incommunicado interrogation of individuals in a
9               police-dominated atmosphere. That atmosphere is said to generate
                inherently compelling pressures which work to undermine the
10              individual's will to resist and to compel him to speak where he
                would not otherwise do so freely.  Fidelity to the doctrine
11              announced in *Miranda* requires that it be enforced strictly, but only
                in those types of situations in which the concerns that powered the
12              decision are implicated.

13   *Id*. at 296 (internal quotations and citations omitted) (holding that conversations between

14   incarcerated suspects and undercover agents believed to be fellow inmates do not implicate the

15   concerns underlying *Miranda*).

16          Relevant to the custody determination are "the objective circumstances of the

17   interrogation, not the subjective views harbored by either the interrogating officers or the person

18   being questioned." *Stansbury*, 511 U.S. at 323.  It does not matter, for example, whether a police

19   officer subjectively determines that an individual will be taken into custody, so long as the officer

20   never communicated his intention to the motorist during the relevant questioning.  *Id*. at 442.

21   "Under *Miranda*, '[a] policeman's unarticulated plan has no bearing on the question whether a

22   suspect was in custody at a particular time'; 'the only relevant inquiry is how a reasonable man in

23   the suspect's position would have understood the situation.'" *Stansbury*, 511 U.S. at 324-25

24   (quoting *Berkemer*, 468 U.S. 442).

25          Although Supreme Court precedent provides the only relevant source of clearly

26   established federal law for AEDPA purposes, circuit precedent can be "persuasive authority for

1   purposes of determining whether particular state court decision is an 'unreasonable application'

2   of Supreme court law," and in ascertaining "what law is 'clearly established.'" *Duhaime v.*

3   *Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000).'"); *see also Clark v. Murphy*, 331 F.3d 1062,

4   1072 (9th Cir. 2003).  The Ninth Circuit Court of Appeals has elaborated on the "totality of

5   circumstances" inquiry by identifying several factors relevant to the "in custody" determination.

6   They include:

7               (1) the language used to summon the individual; (2) the extent to
               which the defendant is confronted with evidence of guilt; (3) the
8               physical surroundings of the interrogation; (4) the duration of the
               detention; and (5) the degree of pressure applied to detain the
9               individual.

10  *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001) (citing *United States v. Beraun-*

11  *Panez*, 812 F.2d 578, 580, *amended by* 830 F.2d 127 (9th Cir. 1987) and *United States v.*

12  *Wauneka*, 770 F.2d 1434, 1438 (9th Cir. 1985)).

13              In the last reasoned state court decision applicable to this claim, the California

14  Court of Appeal, Third District, held:

15              [W]e conclude that Defendant was not in custody when he made
               the incriminating statements to Deputy Kropholler.  To begin with,
16              the questions were asked by a single officer, accompanied by an
               unarmed cadet, in a nonconfrontational manner.  Although the
17              questioning took place in the back of the patrol car (not an unusual
               occurrence during an extended traffic stop or accident
18              investigation), defendant was not handcuffed and was specifically
               advised that he was not under arrest.  Incident to the search, Deputy
19              Kropholler simply asked defendant about the gun, and when
               defendant pled ignorance, he asked if defendant could explain why
20              Ripley had told him otherwise.  Considering all of the pertinent
               factors and circumstances of the questioning, we conclude a
21              reasonable person would not have experienced a restraint
               tantamount to an arrest. (*People v. Aguilera*, *supra*, 51 Cal.App.4th
22              at p. 1162; *U.S. v. Murray* (7th Cir. 1996) 89 F.3d 459, 462.)
               Therefore, the trial court did not err in concluding defendant was
23              not "in custody" when he made the incriminating statements.

24  *People v. Cromwell*, *supra*, slip op. at 7-8.

25              Contrary to the state court's determination, based on the totality of the

26  circumstances in this case, after initially being detained for a routine traffic violation, petitioner

10

1    was "subjected to treatment that render[ed] him 'in custody' for practical purposes..." *Berkemer*,

2    *supra*, 468 U.S. at 440.  Moreover, for the reasons that follow, the state court's decision was an

3    unreasonable application of clearly established Supreme Court precedent.

4             According to the record, police dispatch logged the traffic stop at 12:28 hours,

5    after which Deputy Kropholler took petitioner's name and returned to the police car for a records

6    check.  Once Kropholler learned that petitioner was on parole, he conducted a pat-down search,

7    informed petitioner that he was going to conduct a parole search of the car, and directed him to

8    take a seat in the back of the police car.  Although petitioner was not handcuffed until his formal

9    arrest, his freedom of movement was entirely limited once he was placed in the back of the police

10   car, since those doors automatically lock when closed, according to Kropholler's testimony.

11   Kropholler then searched the vehicle and located the firearm.  These events took only several

12   minutes combined.  Nevertheless, once the firearm was located, a reasonable person under the

13   circumstances would have understood that substantial grounds for arrest existed, that arrest was

14   in fact imminent, that he was therefore not free to leave, and that he was not going to be merely

15   detained for a brief time and then released.  *See United States v. Newton*, 369 F.3d 659, 673 (2nd

16   Cir. 2004) (parolee handcuffed during a parole search of his mother's residence was in *Miranda*

17   custody once a firearm was located, even though he had previously been told he was not under

18   arrest); *see also Id*. at 679 (noting that once the charged firearm was located, it was "plain" that

19   the parolee would be formally arrested).

20             In finding that a reasonable person in petitioner's situation would not have

21   experienced a restraint on freedom tantamount to arrest in this case, the state court relied, in part,

22   on the fact that the questions at issue were asked by a single officer in a nonconfrontational

23   manner.  In a situation where a parolee has been discovered in possession of a gun, however, the

24   fact that only one officer is currently on the scene makes the situation no less police-dominated to

25   a suspect who is already confined in the back of a police car and virtually certain to be arrested.

26   Moreover, although the state courts found that Deputy Kropholler posed his questions in a

1   "nonconfrontational" manner, the very questions pose the threat of arrest.  It is also noteworthy

2   that, by being placed in the police car, petitioner was separated from Ms. Ripley, whose

3   statement Deputy Kropholler took and confronted petitioner with, prior to his formal arrest.

4           The only other factors specifically cited by the state court to support its conclusion

5   that petitioner was not "in custody" were that petitioner was not handcuffed and that he was

6   specifically advised that he was not under arrest.  Although petitioner was initially advised that

7   he was not under arrest, that occurred prior to the parole search, and prior to the moment that

8   Deputy Kropholler found a gun in the back of the car he was driving.  The fact that a suspect is

9   advised he is not under arrest is not conclusive to the *Miranda* determination. *See United States

10  v. Henley*, 984 F.2d 1040 (9th Cir. 1993) (questions posed prior to arrest constituted custodial

11  interrogation where the suspect had been handcuffed and placed in the squad car before he was

12  questioned, despite fact that suspect was informed he was *not* under arrest).  In *Henley*, the Ninth

13  Circuit held:

14              Whether Henley was in custody at the time he admitted owning the
            car is easily resolved.  Although Henley had not been formally
15          arrested, he was handcuffed and placed in the back seat of a squad
            car.  An FBI agent entered the vehicle and identified himself as
16          such.  The agent explained that he was investigating a bank
            robbery and that the officers believed Henley's car had been
17          involved.  While Henley was told that he was not under arrest, he
            testified that he did not feel free to leave.  It is fair to say that
18          someone who is being questioned by an FBI agent while sitting
            handcuffed in the back of a police car is, indeed, not free to leave.
19          We have no trouble concluding that Henley "ha[d] been taken into
            custody or otherwise deprived of his freedom of action in [a]
20          significant way."  *Miranda*, 384 U.S. at 444, 86 S. Ct. At 1612.

21  *Henley*, 984 F.2d at 1042.

22          Although petitioner experienced a lesser restraint on his freedom than the

23  petitioner in *Henley*, to the extent that he was not handcuffed, it is equally fair to say that

24  petitioner was not free to leave.  It would appear that a parolee in the back seat of a police car

25  being questioned by a police officer who has just discovered him to be in possession of a gun

26  experiences the functional equivalent of being taken into custody, despite the fact that he does

12

1  not yet wear handcuffs.  *But see United States v. Murray*, 89 F.3d 459, 462 (7th Cir. 1996)

2  (finding that a non-parolee in the back of a police car would not have reasonably considered brief

3  questioning about the drugs and loaded gun found in his car to be a custodial interrogation).[5]

4         Again, the "ultimate inquiry is simply whether there was a formal arrest or

5  restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury*, 511

6  U.S. 318, 324 (1994); *see also Quarles*, 467 U.S. at 655 (holding that person surrounded by four

7  police officers and handcuffed "was in police custody because we have noted that the ultimate

8  inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the

9  degree associated with a formal arrest" (internal quotation marks omitted)).  Importantly, where a

10 person formerly at liberty is subjected to formal arrest or comparable restraints, specific coercive

11 pressures need not be proved to establish *Miranda* custody; rather, coercive pressures are

12 presumed from the fact of such custody.  *See Newton*, 369 F.3d at 670; *see also Quarles*, 467

---

14        [5]  With respect to the Seventh Circuit's *Murray* case, the undersigned agrees with the
15 concurring opinion of Judge Eschbach, who wrote separately to express his disagreement with the
   conclusion of the majority that Murray was not "in custody" when he made the statements at
16 issue:

            The record reveals that the back seat of the squad car, when the
17          doors are closed, is analogous to a prison cell.  The rear doors
            cannot be opened from the inside of the car, and a partition divides
18          the front and rear seats.  Not only was Murray's freedom
            "restrained," it was impossible for him to escape.  That, of course,
19          is the very reason that Davison placed him in the back of the squad
            car in the first place.  After Shepardson found drugs and a gun in
20          Murray's car, Davison opened the door and asked Murray: who
            owned the gun; who owned the car; whether Murray had loaned the
21          car to anyone that day; and, whether anyone else had access to the
            car.  While questioning Murray, Davison stood by the door of the
22          car.  Although it is true that Murray was not handcuffed, the use of
            handcuffs is not a prerequisite to a finding of custody.  I also do not
23          believe that the custodial nature of the questioning changed just
            because the car door was open when Davison questioned Murray.
24          Unless Murray was prepared to tackle Davison, he was unable to
            leave the car.  In my opinion, no reasonable person in Murray's
25          shoes would have felt free to leave the back seat of the squad car;
            Murray was "in custody."

26 *Murray*, 89 F.3d at 463-64 (Eschbach, J., concurring in judgment).

U.S. at 654 ("The *Miranda* court... presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights." (footnote omitted)).

In sum, based on the totality of circumstances in this case, a reasonable person in petitioner's situation would have experienced a restraint on freedom of movement comparable to a formal arrest. *Beheler*, 463 U.S. 1121, 1125 (1983). This restraint occurred as soon as Kropholler located the gun in petitioner's car during the parole search and so informed petitioner. In addition, it was reasonable to believe that Kropholler's questions about the gun would illicit an incriminating response. Since petitioner was not *Mirandized* prior to the questioning, his responses should have been suppressed. For the reasons discussed herein, the state court's contrary holding is an unreasonable application of Supreme Court precedent.

Granting the writ is only required, however, if the *Miranda* error was not harmless. *Ghent v. Woodford*, 279 F.3d 1121, 1126 (9th Cir. 2002). On habeas corpus review, a federal court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Fry v. Pliler*, 551 U.S. 112 (2007). The relevant question is whether the *Miranda* violation "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (internal quotation marks and citation omitted).

Here, petitioner's jury was instructed that the prosecution had to establish two elements in order to prove the charged crime: "First[,] the defendant had in his possession or had under his control a shotgun; and second, the defendant had knowledge of the presence of the shotgun." (RT at 322.) The jury was instructed that one person may have possession alone or that two or more persons may share actual or constructive possession. (RT at 322.)

At trial, only three witnesses testified: Deputy Kropholler; Samantha Cheney, fingerprint analyst; and Carolyn Sherrell, petitioner's mother.

1   Kropholler testified that petitioner appeared nervous from the initial moments of

2  the traffic stop.  (RT at 193.)  Upon being stopped, petitioner stated that he was coming from his

3  mother's house and headed to a nearby residence.  (RT at 217.)  Kropholler determined that

4  petitioner was not the registered owner of the car.  (RT at 217.)  Kropholler testified that he told

5  petitioner he was going to perform a parole search of the car, to which petitioner responded

6  "sure, no problem."  (RT at 216.)

7   In the trunk, Kropholler found a camouflage gun bag sitting on top of clothing and

8  personal items.  (RT at 200.)  He testified that clothing and personal items he observed in the car

9  led him to believe that someone was living out of the car.  (RT at 199-200, 210.)

10   Kropholler testified "[a]t first, he told me he had no idea that [the gun] was in the

11  car."  (RT at 205.)  After Kropholler told petitioner he had spoken to Ripley about the gun,

12  however, petitioner said he wanted to tell the truth: "He'd just picked up the shotgun from his

13  mother's house so he could go shooting with his boss over the weekend."  (RT at 206.)  Ripley's

14  hearsay statement to Kropholler that they had just picked up the gun at petitioner's parents' home

15  so that he could go target shooting with his boss the next day did not come into evidence.

16  Nevertheless, the jury heard Kropholler's testimony that petitioner "changed his story" after

17  being confronted with a statement Ripley had already made to Kropholler.  Kropholler also

18  testified that petitioner acknowledged that he knew he was not supposed to be in possession of

19  any firearms.  (RT at 206.)

20   Carolyn Sherrell, petitioner's mother, testified that she was the owner of the

21  Toyota that petitioner was driving (RT at 277), and that the shotgun belonged to her boyfriend,

22  Mike Noland.  (RT at 273).  Sherrell testified that, on the day in question, petitioner and his

23  girlfriend walked over to her house to ask either for a ride to work the next morning, or, in the

24  alternative, if his girlfriend could borrow her car to take him to work the next morning.  (RT at

25  276.)  Sherrell testified that she had put the shotgun in the trunk of the car so that she and her

26  boyfriend could go hunting and that she forgot to tell petitioner about the gun in the trunk when

1  he and his girlfriend borrowed the car.  (RT at 281.)  On cross-examination, it was established

2  that petitioner's mother learned of his arrest that night, but that she made no attempt to contact

3  police to tell them that she had put the shotgun in the car and that petitioner did not know about

4  it.  (RT at 285-86.)

5          Samantha Cheney, crime scene investigator and fingerprint analyst, testified that

6  she attempted to lift the two "best developed" latent fingerprints from the shotgun, but that

7  neither were usable for identification purposes.  (RT at 260-61, 263.)

8          Based on a review of all the testimony and argument at trial, it appears that the

9  admission of petitioner's statements taken in violation of *Miranda* had a substantial and injurious

10  effect on the jury's verdict.  The prosecution had the burden to prove that petitioner knew the gun

11  was in the trunk of the car, as knowledge is an essential element of the offense of felon in

12  possession of a firearm.  *See* CALJIC No. 12.44.  The prosecutor submitted to the jury that

13  knowledge was, in fact, "the gravamen... of this case," and that petitioner's statements

14  "confessed to the officer that he knew [the gun] was there," thus providing direct evidence of

15  knowledge.  (RT at 338-40.)  Other than petitioner's statements to Kropholler, however, no

16  substantial evidence demonstrated that he knew the gun was in the vehicle.  Ripley did not

17  testify, and her statements to Kropholler did not come into evidence.  The fingerprints taken from

18  the shotgun were insufficient to make an identification.

19          Moreover, petitioner put on a defense.  Sherrell, petitioner's mother and the owner

20  of the vehicle, testified that the shotgun belonged to her boyfriend, Noland, who used it for target

21  shooting.  The shotgun was in the trunk of the car because Sherrell and Noland planned to go

22  hunting but had cancelled their plans.  Sherrell then loaned the car to petitioner and Ripley but

23  failed to remove the shotgun from the trunk or tell petitioner it was there.

24          The prosecution argued that the case boiled down to a credibility contest between

25  Kropholler and petitioner's mother on the element of knowledge.  (RT at 324-25.)  The

26  conflicting testimonies of Kropholler and Sherrell were indeed the only direct evidence on the

1  crucial issue of knowledge.  It appears that the only other piece of evidence relied upon by the

2  prosecution to demonstrate knowledge was Kropholler's testimony that petitioner appeared

3  nervous when pulled over.  In his closing argument, the prosecutor argued that petitioner

4  appeared nervous because he knew Kropholler was going to find a gun in the car.  (RT at 326-

5  27.)  The defense argued, to the contrary, that petitioner appeared nervous during the traffic stop

6  because he was a parolee and he was driving without a license.  (RT at 333.)  The defense's

7  argument on this issue was as plausible as the prosecution's argument.  Accordingly, without

8  Kropholler's testimony as to petitioner's statements taken in violation of *Miranda*, there was

9  virtually no evidence, direct or circumstantial, that petitioner knew the gun was in the car.

10      In sum, without Kropholler's testimony as to petitioner's statements taken in

11  violation of *Miranda*, the prosecution had virtually no evidence of knowledge, a required element

12  of the charged offense: being a felon in possession of a firearm.  Under these circumstances,

13  improper admission of the statements had substantial and injurious effect or influence on the

14  jury's verdict.  Relief shall issue for the claim of *Miranda* error.

15      B.      *Romero* Motion

16      Prior to sentencing, and pursuant to *People v. Superior Court (Romero)*, 13

17  Cal.4th 497 (1996),[6] petitioner moved to strike one or both of his prior serious felony convictions

18  arising from two 1993 burglaries.  Petitioner claims that the trial court erred in violation of his

19  due process rights when it denied his motion.

20  /////

21      To the extent petitioner argues the trial court simply erred in its analysis of his

22  *Romero* motion, the claim relates solely to the application of a state sentencing law and presents

23  no federal question.  Absent fundamental unfairness, federal habeas corpus relief is not available

24  _____

25      [6] Pursuant to the holding of the California Supreme Court in *Romero*, a trial court has
    statutory discretion to strike prior serious felony convictions alleged for sentence enhancement
26  purposes, even in the absence of a motion requesting that action by the prosecuting attorney.

1  for a state court's misapplication of its own sentencing laws.  *Estelle*, 502 U.S. at 67; *Middleton*

2  *v. Cupp*, 768 F.2d at 1085; *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1989) (petitioner not

3  entitled to habeas relief on claim that state court improperly used prior federal offense to enhance

4  punishment); *Miller v. Vasquez*, 868 F.2d 1116, 1118-19 (9th Cir. 1989) (claim that prior

5  conviction was not a "serious felony" under California sentencing law not cognizable in federal

6  habeas corpus proceeding).

7         A petitioner may not "transform a state-law issue into a federal one merely by

8  asserting a violation of due process."  *See Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997).

9  Nevertheless, petitioner alleges that his due process rights were violated when the court denied

10  the *Romero* motion based on its own finding, as opposed to a finding of the jury, that petitioner

11  possessed the gun for an illegal purpose.

12         In *Apprendi\ v. New Jersey*, 530 U.S. 466, 490 (2000), the United States Supreme

13  Court held that, based on a criminal defendant's Sixth Amendment right to trial by jury, "[o]ther

14  than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the

15  prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable

16  doubt."  The Supreme Court subsequently clarified that "the 'statutory maximum' for *Apprendi*

17  purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected*

18  *in the jury verdict or admitted by the defendant*."  *Blakely v. Washington*, 542 U.S. 296, 303-304

19  (2004) (emphasis in original).

20         At the hearing on petitioner's judgement and sentencing, the court explained its

21  intent to deny petitioner's motion to dismiss the priors:

22         My tentative [ruling] is not to grant the Romaro [sic] motion based
       on the fact that he does have some minimal violence, that I believe
23       the possession of the shotgun and a reflection under all of the
       circumstances [sic] was not for a legitimate legal purpose, which is
24       target shooting, in violation of [Penal Code section] 12020.

25         Mr. Cromwell dodged a bullet when he escaped 25 to life on the
       11378 [possession of methamphetamine for sale] conviction.  Why
26       he chose to be in possession of the shotgun on the occasion that he

1  was convicted, I can only conclude that it was for an illegal
   purpose.  And so I don't believe that striking a strike is
2  inappropriate [sic] for Mr. Cromwell based on his record and
   continuing record...
3

4  (RT May 12, 2004 at 2-3.)  Following argument from both parties, the court denied the motion.

5  (RT at 9.)

6          As petitioner asserts, the jury made no finding as to whether he possessed the gun

7  for a legal or illegal purpose.  Fatal to his claim, however, is that he was sentenced under

8  California's three strikes law (*see* Cal. Penal Code §1170.12), and not under the state's

9  determinate sentencing scheme.  (Clerk's Transcript ("CT") at 225-26.)  Petitioner's sentence

10 was not based on judicial selection of an upper term out of three possible terms as in *Apprendi*,

11 *Blakely*, and subsequent cases.  Neither the trial court's refusal to dismiss the prior strike under

12 *Romero*, nor the imposition of the indeterminate life term, nor the calculation of petitioner's life

13 term increased his sentence beyond the statutory maximum term.  Rather, the jury verdict and the

14 fact of petitioner's two prior convictions authorized the given sentence, regardless of any

15 additional fact-finding undertaken by the judge.  *Apprendi* and *Blakely* are inapplicable to

16 petitioner's sentencing.  *See generally United States v. Booker*, 543 U.S. 220, 233 (2005)

17 ("[W]hen a trial judge exercises his discretion to select a specific sentence within a defined

18 range, the defendant has no right to a jury determination of the facts that the judge deems

19 relevant."); *see also People v. Murphy*, 124 Cal.App.4th 859, 863 (3rd Dist. 2004) (factual

20 findings that a trial court makes in denying a *Romero* motion do not result in an increased

21 sentence for a defendant within the meaning of *Blakely* and *Apprendi*); *People v. Urbano*, 128

22 Cal.App.4th 396, 404-405 (5th Dist. 2005) (*Blakely* inapplicable where "through an exercise of

23 judicial discretion the court simply chose not to *decrease* [the defendant's] sentence...").

24          Because no violation of the Constitution or laws of the United States occurred

25 when the judge denied petitioner's *Romero* motion, petitioner is not entitled to relief for this

26 claim.

1       C.      Sentence Imposed

2               Petitioner claims that a sentence of twenty seven years to life for the offense of

3   conviction constitutes cruel and unusual punishment under both the California Constitution and

4   the United States Constitution.

5               As an initial matter, to the extent that petitioner alleges that his sentence violates

6   the California Constitution, his claim fails.  As previously set forth, federal habeas corpus relief

7   will not lie to correct an alleged error in the interpretation or application of state law.  *Estelle*,

8   502 U.S. at 67-68.

9               A criminal sentence that is not proportionate to the crime of conviction may

10  indeed violate the Eighth Amendment of the United States Constitution.  Outside of the capital

11  punishment context, however, the Eighth Amendment "forbids only extreme sentences that are

12  grossly disproportionate to the crime." *Graham v. Florida*, 130 S. Ct. 2011, 2021 (2010) (*quoting*

13  *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and

14  concurring in judgment).  The United States Supreme Court held that the gross disproportionality

15  principle is the only relevant clearly established law applicable to an Eighth Amendment

16  challenge to a sentence under section 2254.  *Lockyer v. Andrade*, 38 U.S. 63 (2003).  The

17  threshold for an inference of gross disproportionality is high.  Generally, so long as the sentence

18  imposed by the state court does not exceed statutory maximums, it will not be considered cruel

19  and unusual punishment under the Eighth Amendment.  *United States v. McDougherty*, 902 F.2d

20  569, 576 (9th Cir. 1990); *United States v. Mejia-Mesa*, 153 F.3d 925, 930 (9th Cir. 1998)

21  ("punishment within legislatively mandated guidelines is presumptively valid").

22              In *Rummel v. Estelle*, the United States Supreme Court upheld a term of life with

23  the possibility of parole against a similar Eighth Amendment challenge.  445 U.S. 263, 285

24  (1980).  Rummel was sentenced under a recidivism statute.  *Id*. at 265.  His two prior offenses

25  were fraudulent use of a credit card and passing a forged check in the amount of $28.36.  *Id*.  His

26  triggering offense was a conviction for the theft of $120.75 by false pretenses.  *Id*. at 266.  The

1    life sentence in *Rummel* was held not to offend the gross proportionality principle of the Eighth

2    Amendment.  Likewise, in *Harmelin v. Michigan*, the Supreme Court held that a term of life in

3    prison without the possibility of parole was not disproportionate to the crime of possession of

4    672 grams of cocaine.  501 U.S. 957, 1009 (1991).

5         The United States Supreme Court has also upheld a decision of the California

6    Court of Appeal affirming a sentence of two consecutive terms of 25 years to life in prison for a

7    "third strike" conviction of theft of $150 worth of video tapes.  *Lockyer v. Andrade*, 538 U.S. 63

8    (2003).  The Supreme Court held that such a sentence was not contrary to or an unreasonable

9    application of the gross disproportionality principle.  *Id*. at 73-74 (2003).  Petitioner's attempts to

10   distinguish his convictions, prior recidivism, and resulting sentence, fail.

11        Petitioner's commitment offense and two prior strikes are constitutionally

12   sufficient for the state of California to have concluded that he is unable to bring his conduct

13   within the social norms prescribed by the criminal law of the State.  *See Ewing v. California*, 528

14   U.S. 11, 29-30 (2003), citing *Rummel*, 445 U.S. at 284.  Petitioner's is not "the rare case in which

15   a threshold comparison of the crime committed and the sentence imposed leads to inference of

16   gross disproportionality."  *Harmelin*, 501 U.S. at 1005.  Accordingly, no relief is available for

17   this claim.

18         D.      Prior Plea Agreement

19        In 1993, petitioner pleaded guilty to two counts of first degree burglary in Shasta

20   County, case number 93-2375.  In connection with that plea, he signed a form indicating that he

21   acknowledged as a result of his plea that he might be subject to certain consequences in addition

22   to the imposed term of imprisonment.  Specifically, in relevant part, petitioner initialed

23   acceptance of the following statement: "I understand this conviction could add 10 years to a

24   future prison term if I am convicted of certain felonies as listed in Penal Code § 667(a) or Health

25   and Safety Code § 11370.2."  (Augmented CT at 21.)

26        Petitioner contends that when he pleaded guilty to the 1993 offenses, "the

1   prosecutor promised him that by doing so, no matter what future conviction occurred, his [1993]

2   plea of guilty would increase his [future] sentence by no more than 10 years."  Petitioner claims

3   that his 1993 plea agreement was then breached when those convictions were used to impose a

4   determinate life sentence pursuant to California's three strikes law following his conviction of

5   felon in possession of a firearm.

6           A criminal defendant has a due process right to enforce the terms of a plea

7   agreement.  *See generally Santobello v. New York*, 404 U.S. 257, 261-62 (1971) ("[W]hen a plea

8   rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said

9   to be a part of the inducement or consideration, such promise must be fulfilled."); *see also*

10  *Buckley v. Terhune*, 441 F.3d 688, 694 (9th Cir. 2004) ("Under *Santobello v. New York*, a

11  criminal defendant has a due process right to enforce the terms of his plea agreement.") (citation

12  omitted).  The party asserting the breach bears the burden of proving the underlying facts

13  establishing a breach by preponderance of the evidence.  *See United States v. Packwood*, 848

14  F.2d 1009, 1011 (9th Cir. 1988) ("government has the burden of proof to show that [defendant]

15  breached the agreement, by a preponderance of the evidence) (citation omitted); *see also United*

16  *States v. Laday*, 56 F.3d 24, 26 (5th Cir. 1995) ("A defendant asserting a breach bears the burden

17  of proving, by preponderance of the evidence the underlying facts establishing a breach.")

18           It is clearly established federal law that state courts must construe and interpret

19  plea agreements and the concomitant obligations flowing therefrom in accordance with state

20  contract law.  *Buckley v. Terhune*, 441 F.3d 688, 694-95 (9th Cir. 2006).  Accordingly, a state

21  prisoner may be entitled to relief in a federal habeas corpus proceeding if the state courts have

22  failed to properly apply state contract law when interpreting a plea agreement.  *Id*.

23  /////

24           In this case, petitioner fails to establish a breach of his 1993 plea agreement.  In

25  California, contracts (including plea bargains) are deemed to incorporate and contemplate not

26  only the existing law, but also the reserve power of the state to amend the law or enact additional

1   laws.  *Davis v. Woodford*, 446 F.3d 957, 962 (9th Cir. 2006) (citing *People v. Gipson*, 117

2   Cal.App.4th 1065 (2004)).  Here, the quoted plea advisement was a warning of possible

3   consequences; it did not purport to promise that future use of the convictions would forever be

4   limited to enhancing new sentences by only 10 years.  Nor did it promise that petitioner would

5   not be subject to future California sentencing laws as amended, or that such laws would not be

6   changed.

7           Indeed, in the year following petitioner's prior plea agreement, California's "three

8   strikes" law became effective.  *See* Cal. Penal Code §667, subds. (b)-(i) (effective March 7,

9   1994); *People v. Superior Court*, 113 Cal.App.4th 817, 824 (6th Dist. 2003).  California courts

10  have consistently held that any pre-March 7, 1994 convictions could thereafter be used as strikes.

11  *See, e.g.*, *People v. Sipe*, 36 Cal.App.4th 468, 476-79 (3rd Dist. 1995).  It was reasoned that,

12  because a prior conviction did not have effect as a strike unless and until the defendant

13  committed a new felony, the future use of the conviction was not a direct consequence requiring

14  advisement in any prior plea agreement.  *Id*. at 479.  Accordingly, because the record does not

15  show that any term of petitioner's prior plea agreement was breached, he is not entitled to relief

16  for this claim.

17          E.      Ineffective Assistance of Counsel

18          Petitioner also claims that trial counsel in the present case rendered ineffective

19  assistance by failing to adequately investigate or discover the enhancement terms of the prior

20  1993 plea agreement.  Under the applicable standard of *Strickland v. Washington*, petitioner must

21  establish both deficient performance and prejudice in order to succeed on his claim of ineffective

22  assistance of counsel.  466 U.S. 668, 687-96 (1984).  Since petitioner's 1993 plea agreement was

23  not breached, he fails to demonstrate deficient performance on the part of trial counsel, or that

24  prejudice resulted and he is not entitled to relief for this claim.

25  /////

26  /////

VI.  CONCLUSION

Petitioner has demonstrated that he suffered a violation of the Constitution or laws of the United States when his pre-arrest statements were admitted at trial, and also that the state courts' rejection of his *Miranda* claim was contrary to clearly established Supreme Court precedent.  Accordingly, the petition for writ of habeas corpus is hereby GRANTED in part, as to this claim, and denied in part, as to the remaining claims.  Respondent is therefore ordered to release petitioner from custody on Shasta County Superior Court case number 03F4527, unless, within 90 days, the State of California elects to retry him.

IT IS SO ORDERED.

DATED: April 18, 2011

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE